# UNITED STATES DISTRICT COURT

for the
Southern District of California

| | | |
|---|---|---|
| In the Matter of the Search of | ) | |
| *(Briefly describe the property to be searched* | ) | |
| *or identify the person by name and address)* | ) | Case No.    25-mj-01711-MSB |
| A Blue ASUS Model # TP200S Laptop Computer, FP&F | ) | |
| 2025250100031901-001 | ) | |
| | ) | |

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A-1, incorporated herein by reference.

located in the _____Southern_____ District of _____California_____ , there is now concealed *(identify the person or describe the property to be seized)*:

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

❏ contraband, fruits of crime, or other items illegally possessed;

❏ property designed for use, intended for use, or used in committing a crime;

❏ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21: 841; 846; 952; 960; 963 | Possession with intent to Dist. and Consp. to Dist. and Impt. Cont. Subs's. |
| 21: 848(e)/18:1512(a)(1)(A) | Murder in furtherance of a drug trafficking consp.; Witness Tampering Murd. |
| 18:1956 | Money Laundering |

The application is based on these facts:

See attached affidavit.

☑ Continued on the attached sheet.

❏ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Travis Desmond*
*Applicant's signature*

_____
Travis Desmond, Special Agent, HSI
*Printed name and title*

Sworn to before me and signed in my presence.

Date:    4/10/25

_____
*Judge's signature*

City and state:    San Diego, CA

Michael S. Berg, United States Magistrate Judge
*Printed name and title*

## AFFIDAVIT IN SUPPORT OF APPLICATION FOR SEARCH WARRANTS

I, Travis Desmond, being duly sworn, declare and state:

## INTRODUCTION

1.     This affidavit is made in support of an application to search the following seized electronic devices (the Target Devices) described as follows below and in more detail in Attachments A-1 through A-3:

a)     Blue ASUS Model # TP200S Laptop Computer, FP&F 2025250100031901-001 (**Target Device 1**). As set forth in Attachment A-1, **Target Device 1** is believed to have been used by Benjamin MADRIGAL (MADRIGAL) between on or about January through April 3 of 2023. On April 3, 2023, MADRIGAL was arrested at 19161 Goodfellow Ave., Reedley, California, which is near Fresno California, on charges stemming from this investigation (23-CR-1684-DMS). Agents seized **Target Device 1** on February 18, 2025, from the current residents of 19161 Goodfellow Ave. **Target Device 1** is currently in the possession of HSI in the Southern District of California at 2055 Sanyo Ave #120, San Diego, CA.

b)     Silver HP Chromebook Model # 11-v010wm Laptop Computer, FP&F 2025250100031901-002 (**Target Device 2**). As set forth in Attachment A-2, **Target Device 2** is believed to have been used by Benjamin MADRIGAL (MADRIGAL) between on or about January through April 3 of 2023. On April 3, 2023, MADRIGAL was arrested at 19161 Goodfellow Ave., Reedley, California, which is near Fresno California, on charges stemming from this investigation (23-CR-1684-DMS). Agents seized **Target Device 2** on February 18, 2025, from the current residents of 19161 Goodfellow Ave. **Target Device 2** is currently in the possession of HSI in the Southern District of California at 2055 Sanyo Ave #120, San Diego, CA.

c)     Black USB drive model Micro SD USB 2.0, FP&F 2025250100031901-003 (**Target Device 3**). As set forth in Attachment A-3, **Target Device 3** is believed to have been used by Benjamin MADRIGAL (MADRIGAL) between on or about January through

April 3 of 2023. On April 3, 2023, MADRIGAL was arrested at 19161 Goodfellow Ave., Reedley, California, which is near Fresno California, on charges stemming from this investigation (23-CR-1684-DMS). Agents seized **Target Device 3** on February 18, 2025, from the current residents of 19161 Goodfellow Ave. **Target Device 3** is currently in the possession of HSI in the Southern District of California at 2055 Sanyo Ave #120, San Diego, CA.

2.      The **Target Devices** were found on February 18, 2025, by the current residents of 19161 Goodfellow Ave, Reedley, CA (the residence). At the time of his arrest on April 3, 2023, MADRIGAL resided at the residence. MADRIGAL has not resided at the residence since his arrest on April 3, 2023. The current resident moved into the residence after MADRIGAL's departure.

3.      On or about February 18, 2025, the current resident was cleaning the laundry room in the residence and noticed something that blended in with the laundry room wall. After taking a closer look, the current resident realized it was a computer bag which did not belong to the current resident and had apparently been left by a prior resident. The **Target Devices** were found inside of that bag. The current resident called local police, who in turn notified my agency. My agency took possession of the Target Devices on February 18, 2025.

4.      I submit that the facts contained herein demonstrate probable cause to believe that the fruits, instrumentalities, and evidence of Violations of Title 21, United States Code, Sections 841(a)(1), 846, 952, 960, 963 (Possession of Controlled Substances with Intent to Distribute; Conspiracy to Distribute Controlled Substances; Importation of Controlled Substances and Conspiracy), and 848(e) (murder in furtherance of a drug trafficking conspiracy); Title 18, United States Code Section 1512(a)(1)(A) (Witness Tampering by murder), and 1956 (Money Laundering) (collectively referred to

as the Target Offenses), are located in the **Target Devices**, and seek authorization to search for and seize the information identified in Attachment B for the period of June 1, 2021 through April 3, 2023, incorporated herein.

5.    Based upon my experience and training, and all the facts and opinions set forth in this Affidavit, I submit this Affidavit in support of the application to search the **Target Devices** for and to seize, as they pertain to violations of the Target Offenses, all communications, records, or data including but not limited to emails, text messages, photographs, audio files, videos, or location data:

     a.  tending to identify attempts to import and distribute controlled substances, and the collection and transportation of bulk cash proceeds from the sale or distribution of controlled substances within the United States and between the United States and Mexico;

     b.  tending to identify accounts, facilities, storage devices, and/or services– such as email addresses, IP addresses, and phone numbers–used to facilitate the importation and distribution of controlled substances and the collection and transportation of bulk cash proceeds from the sale or distribution of controlled substances within the United States and between the United States and Mexico;

     c.  tending to identify communications regarding pending judicial matters involving the Target Subjects and/or their co-conspirators, or attempts to impede law enforcement in their investigative duties;

     d.  tending to identify co-conspirators, criminal associates, or others involved in the importation and distribution of controlled substances and the collection and transportation of bulk cash proceeds from the sale or distribution of controlled substances within the United States and between the United States and Mexico;

     e.  tending to identify travel to or presence at locations involved in the importation and distribution of controlled substances and the collection and transportation of bulk cash proceeds from the sale or distribution of

controlled substances within the United States and between the United States and Mexico, such as stash houses, load houses, or delivery points;

f.  tending to identify the user of, or persons with control over or access to, the **Target Device**; and/or

g.  tending to place in context, identify the creator or recipient of, or establish the time of creation or receipt of communications, records, or data involved in the activities described above.

6.    The facts set forth in this affidavit are based on my own personal knowledge, knowledge obtained from other individuals during my participation in this investigation, including other law enforcement officers, my review of documents and computer records related to this investigation, communications with others who have personal knowledge of the events and circumstances described herein, and information gained through my training and experience. My interpretations of certain statements are set forth in brackets and are based upon my knowledge of this investigation and my training and experience. Because this affidavit is submitted for the limited purpose of establishing probable cause in support of the application for a search warrant, it does not set forth each and every fact learned during the course of this investigation.

## TRAINING AND EXPERTISE

7.    I am a Special Agent with the United States Department of Homeland Security, Immigration and Customs Enforcement, Homeland Security Investigations ("HSI") and have been so employed since December of 2019. I am a graduate of the Criminal Investigator Training Program and the Homeland Security Investigations Special Agent Training Program at the Federal Law Enforcement Training Center ("FLETC") in Glynco, Georgia. During my training at FLETC, I learned the fundamentals of criminal investigations including, but not limited to, preparing affidavits for arrest and search

4

warrants, gathering evidence, preserving crime scenes, and using electronic evidence – all in relation to violations of the United States Code.

8.      I am currently assigned to the Fentanyl Abatement & Suppression Team ("FAST") of the HSI Office of the Deputy Special Agent in Charge, in San Ysidro, California. FAST is an HSI led multi-agency task force focused on stopping the spread of fentanyl in San Diego County and bringing down the overdose rates. FAST was designed to provide support to state and local agencies seeking to attack the problem of fentanyl distribution in the County, and to target fentanyl distributors causing overdoses and deaths. FAST investigates illegal drug trafficking organizations whose operations involve the distribution of wholesale and retail quantities of fentanyl, but due to the current drug landscape, FAST investigations have also uncovered organizations whose operations involve the distribution of wholesale and retail quantities of oxycodone, hydrocodone, alprazolam, anabolic steroids, other controlled pharmaceutical drugs, cocaine, methamphetamine, marijuana, and heroin in and around the San Diego, California area.

9.      Prior to FAST, I was assigned to the San Diego Organized Crime Drug Enforcement Task Force (OCDETF) Strike Force. OCDETF Strike Force plans long-term enforcement investigations of large scale (cartel-level) criminal organizations and coordinates the integration of HSI San Diego criminal investigative capabilities into plans of action against specifically targeted cartels with OCDETF Strike Force partners.

10.     Before HSI, I was employed as an Officer with Customs and Border Protection (CBP) at the San Ysidro Port of Entry from 2017 to 2019. While employed with CBP, I was assigned to the Anti-Terrorism Contraband Enforcement Team (ATCET). ATCET targeted the illicit smuggling of contraband into and out of the United States. I personally interdicted multi-kilogram quantities of illicit controlled substances concealed in hidden compartments and factory voids.

11.     During my law enforcement career, I have had responsibility for investigating, arresting, and prosecuting Drug Trafficking Organizations (DTOs) that utilize the Southern

District of California as an operational corridor. These are often complex investigations that target high-level criminal smuggling organizations. I am trained in and investigate various violations of federal law including human trafficking, narcotics trafficking, firearms trafficking, bulk currency smuggling, and money laundering. I have also worked with other law enforcement agencies in these types of investigations as well.

12.    I have conducted, and assisted in conducting, over 400 federal and state drug investigations. I have debriefed defendants, informants, and witnesses with personal knowledge regarding major DTOs, and have also debriefed street lever buyers, dealers, and suppliers, including undercover operations, conducted surveillance, and made over 500 criminal arrests. Through these investigations, I have gained knowledge regarding the ordinary meaning of controlled substance slang and jargon. I have also been responsible for a complex, multi-jurisdictional, multi-defendant, Title-III investigation of a Mexico-based DTO importing and distributing muti-kilogram quantities of controlled substances into the United States

13.    I am aware that it is common practice for TCO members to work in concert utilizing cellular telephones and other electronic devices such as computers, tablets, electronic storage devices like thumb drives and compact disks and security cameras. With respect to the importation of controlled substances into the United States and subsequent distribution, as well as the exportation of bulk cash drug proceeds to Mexico, I am aware that TCO members in the United States and Mexico frequently communicate with the individuals responsible for importing, distributing, or exporting the concealed contraband. These communications can occur before, during and after the contraband is imported, exported or distributed into, from and inside the United States. Based upon my training, experience, and consultations with law enforcement officers experienced in drug trafficking investigations, and all the facts and opinions set forth in this affidavit, I am aware that cellular telephones (including their SIM card(s)), as well as other electronic devices such as computers, tablets, electronic storage devices like thumb drives and compact disks and

security cameras  can and often do contain electronic evidence, including, for example, phone logs and contacts, voice and text communications, and data, such as emails, text messages, chats and chat logs from various third-party applications, photographs, audio files, videos, and location data. This information can be stored within disks, memory cards, deleted data, remnant data, slack space, and temporary or permanent files contained on or in the electronic device.

### PROBABLE CAUSE – INTRODUCTION AND BACKGROUND

14.     Since August of 2021, Homeland Security Investigations (HSI) has been investigating a Drug Trafficking Organization (DTO) based in Yakima, Washington and Fresno, California, led by MADRIGAL, that recruited drivers to cross drugs into the United States and distributed those drugs to various locations within the United States. Narcotics couriers who have been charged in this investigation include Ricardo ALFARO, Marco BUSTOS, Fernando GOMEZ, Rafael LOYA, Jaime MALDONADO, and Nicholas PINA. Witness interviews and consensual and court-authorized searches of cell phones used by those couriers revealed that the couriers were recruited and managed by Benjamin MADRIGAL aka "Tony." At the time of his arrest on April 3, 2023, MADRIGAL had been indicted in the District of Oregon for narcotics crimes and had been a fugitive since June 2021.

15.     MADRIGAL was assisted by Cesar MURILLO and Maira HERNANDEZ, who sent wire transfers to load drivers, received narcotics and bulk cash, and dispatched load drivers to destinations within the United States. MADRIGAL was also assisted by Ricardo ORIZABA, who distributed narcotics in the Yakima, Washington area, and served as the main distributor and enforcer for MADRIGAL and the DTO to prevent other members of the DTO from cooperating cooperation with law enforcement.

16.     In late August 2022 I interviewed MURILLO and HERNANDEZ. Witness interviews have revealed that within days of those interviews, MADRIGAL orchestrated the murder of MURILLO and HERNANDEZ, and the concealment of their remains, by

burying them in the desert near Yakima, Washington. Agents found and excavated MURILLO's and HERNANDEZ's remains in September 2023. Autopsies have established that both were killed by multiple gunshot wounds.

17.    On September 8, 2022, agents executed a search warrant in Yakima, Washington at the location where the murders were suspected to have occurred approximately two weeks earlier. Agents seized approximately 31 assault rifles, including one semi-automatic rifle with an affixed projectile launder, U.S. currency, various documents, narcotic packaging materials, digital scales, and fentanyl pills.

**Evidence Tying Multiple Seizures to the Same DTO**

18.    There is probable cause to believe that the seizures described below are tied to the same organization, which operated in Yakima, Washington, the Southern District of California, and the Eastern District of California.

19.    The chart below sets forth the drivers, the date and place, and the drugs seized from a drug trafficking organization (DTO) that MADRIGAL managed:

| Defendant | Date/place drugs Seized | Type/quantity of drugs |
|---|---|---|
| Ricardo ALFARO[1] | 9/9/21, Otay Mesa POE | 29.84 kgs meth, 5.5 kgs fentanyl |
| Marco BUSTOS[2] | 10/18/21, San Ysidro POE | 13.00 kgs fentanyl, 10.06 kgs cocaine, .48 kgs. meth |
| Nicholas PINA[3] | 9/16/21, Grand Junction, CO | 26.8 kgs meth |
| Jaime MALDONADO[4] | 9/28/21, San Ysidro POE | 31.8 kgs meth, 5.34 kgs fentanyl |

20.    In post-arrest interviews and/or subsequent debriefs each of the defendants listed above indicated that they were working for the same DTO. Each defendant was charged with a narcotics offense in the Southern District of California, and except as noted, each defendant has pled guilty. Their connection to the same DTO is corroborated by their phone downloads, crossing histories, and wire transfers, which document extensive

---

[1] SDCA Case No. 21-CR-2869-CAB.
[2] SDCA Case No. 21-CR-3211-JLS.
[3] SDCA Case No. 22-CR-2700-RBM (currently a fugitive).
[4] SDCA Case No. 21-CR-3006-BAS.

communication and travel with each other as well as communications with, and payment from, common coordinators.

21.    I later determined that Fernando GOMEZ, who was arrested on August 5, 2021 (SDCA Case No. 21-CR-2988-AJB) for importing approximately 15 kilograms of methamphetamine from Mexico into the United States, is also associated to this investigation. During a debrief, GOMEZ stated he was recruited by "El Guero" in Visalia, California to smuggle drugs. GOMEZ said El Guero frequented Visalia, CA and Yakima, WA. I later identified "El Guero" as Gilberto ORTIZ.[5]  GOMEZ then recruited his friends, BUSTOS and PINA. GOMEZ stated he drove a drug load vehicle to a house Yakima, Washington. ORTIZ died of a drug overdose in the Spring of 2022. As set forth below, witnesses state that following ORTIZ's death, MURILLO took on leadership responsibilities in Yakima until MURILLO disappeared in early September 2022.

**Identifying Benjamin MADRIGAL as the DTO's load driver coordinator**

22.    Pursuant to either a warrant or consent, or both, agents downloaded cellular phones used by ALFARO, BUSTOS, LOYA (BUSTOS' passenger and co-defendant), PINA, and GOMEZ, each of whom was transporting drugs as set forth in the above chart. Each of those phones had contact with the number (509) 388-4344 (the 4344 number). GOMEZ saved the 4344 number under the contact name "Tony@work". Text messages contained in GOMEZ's phone show that the 4344 number provided direction to GOMEZ during successful smuggling runs in the United States prior to GOMEZ's arrest. ALFARO saved the 4344 number as "Mr. T." Text messages in ALFARO's phone show that the 4344 number provided direction to ALFARO during successful smuggling trips prior to ALFARO's arrest. PINA saved the 4344 number as "T." PINA's phone also shows the 4344 number providing direction to PINA during successful smuggling trips prior to PINA's arrest in Grand Junction, Colorado.

9

23.    In addition, between July 23, 2021, and September 16, 2021, the 4344 number exchanged 528 phone calls, text messages, and voice messages with PINA's phone. Between July 22, 2021, and August 5, 2021, (the day GOMEZ was arrested) the 4344 number exchanged 173 calls, text messages, and voice messages with GOMEZ's phone. Between August 13, 2021, and September 16, 2021, the 4344 number exchanged 111 calls, text messages, and voice messages with BUSTOS' phone. Between August 16, 2021, and August 28, 2021, the 4344 number exchanged 50 calls, text messages and voice messages with ALFARO's phone. The 4344 number also had 16 contacts with the phone believed to be used by ORTIZ, the deceased former leader of the organization in Yakima, Washington, along with numerous other numbers that were also in contact with load drivers and other persons who exchanged wire transfers with members of the organization

24.    Many of these communications with the 4344 number specifically reference drug smuggling operations. For example, GOMEZ sent "Mr. T," using the 4344 number, an image of PINA's driver's license on July 29, 2021, at 2:14 PM. "Mr. T" replied over the 4344 number and said "they are going t pay 6 per car to nic my old man." Which corresponds to the load driver's statements that they were paid $5,000 to $8,000 per loaded vehicle. ALFARO's phone also revealed several communications between ALFARO and "Mr. T" over the 4344 number. On September 3, 2021, ALFARO sent an image of his driver's license to "Mr. T" who replied, "Dude is the address on the ID your actual address? Because the car title will get to that address." I believe that this is a reference to the vehicle registration being mailed to ALFARO. Text messages in PINA's and ALFARO's cell phones discussed keeping certain vehicles. "Marco" (BUSTOS) would have a new black car[6] and a truck was going to PINA. PINA's phone also revealed several communications between PINA and "Mr. T" using the 4344 number. On September 4, 2021, PINA texted

---

[6] BUSTOS was driving a black 2019 Dodge Challenger.

the 4344 number: "Dude I got someone who wants to buy 1,000 blues [fentanyl pills[7]] for $2,000." The 4344 number responds: Ok dude grab the ones in the yellow bag."

25.    Two sources of evidence tie Benjamin MADRIGAL to the 4344 number. First, during an interview, Witness 1, stated that s/he contacted MADRIGAL on the 4344 number on numerous occasions in 2021. Witness 1 is related to HERNANDEZ and was formerly in an intimate relationship with MADRIGAL. Second, GOMEZ's phone had a photo of a Washington state driver's license with MADRIGAL's photo bearing the name "Sebastian Torres."  Subpoenas served on Money Gram show that on September 21, 2021, "Sebastian Torres" used the 4344 number to send a $1,000 wire to MADRIGAL's sister.

26.    Based on this evidence there is probable cause to believe that MADRIGAL managed the load drivers set forth in the above chart.

**MADRIGAL Orchestrates the Murders of MURILLO and HERNANDEZ**

27.    On December 8th, 2022, HSI and DEA agents conducted a proffer with Witness 2. Witness 2 was previously linked to this DTO and investigation after their name was discovered on an insurance card from a seized Infiniti Q50 in Yakima, WA that was used by this DTO. Witness 2 was arrested by DEA and HSI Stockton in California in October of 2022, for distributing fentanyl. Witness 2 told investigators that s/he had information about a murder that occurred in Yakima, WA after agents conducted several warrants in the area.

28.    Witness 2 said s/he is related to MADRIGAL, and that MADRIGAL was the leader of the DTO after the death of former leader, ORTIZ. Witness 2 said s/he has personal knowledge of the DTOs drug trafficking operations and that's/ he has personally transported both drugs and cash for the organization.

29.    Agents showed Witness 2 a picture of MURILLO. Witness 2 identified MURILLO as a former member of the DTO and said MURILLO was murdered in Yakima, Washington on or about the end of August to beginning of September 2022. Witness 2 said

---

[7] My interpretation of coded language is set forth in brackets, and is based on my training, experience, and knowledge of this investigation.

that MADRIGAL called him/her approximately 30 minutes after killing MURILLO. MADRIGAL told Witness 2 that he learned MURILLO was talking to law enforcement. (I interviewed MURILLO and Maira HERNANDEZ on August 22 and 23, 2022.) After MADRIGAL heard this, he confronted MURILLO, searched MURILLO's cell phone, and found text messages between MURILLO and HERNANDEZ discussing how they were going to cooperate with law enforcement and give law enforcement MADRIGAL's location.[8] After seeing this, MADRIGAL became enraged and drove MURILLO to a ranch outside of Yakima where he killed MURILLO.

30.    Witness 2 said that MADRIGAL called him and said that he (MADRIGAL) had MURILLO killed. According to Witness 2, MADRIGAL said that once they were at the ranch, MURILLO was shot to death with an AK-47 style assault rifle. Witness 2 stated Ricardo ORIZABA was also present when MURILLO was killed.

31.    Witness 2 also said that after MURILLO was killed, MADRIGAL contacted HERNANDEZ and used a "ruse" to get her to come to the ranch to meet MURILLO. Witness 2 said that MADRIGAL said MURILLO lost his phone in order to get HERNANDEZ to the ranch to meet MURILLO. Once HERNANDEZ was at the ranch, she was shot with the same assault rifle. MADRIGAL, ORIZABA, and other unknown coconspirators used a commercial backhoe to bury the bodies deep underground. Then they used the backhoe to move large amounts of dirt around the property to make it more difficult for the bodies to be recovered. (During the search warrant on September 8, 2022, agents observed a commercial backhoe on the property).

32.    Witness 2 stated that the ranch was used to store, weigh, separate, package and distribute narcotics, and was primarily operated by MADRIGAL and ORTIZ. Vehicles containing concealed narcotics would drive to the ranch and have the narcotics removed and stored on site pending further distribution throughout the United States. Witness 2 stated

---

[8] At that time, Benjamin MADRIGAL was a fugitive from the District of Oregon, as noted above.

s/he had visited the ranch numerous times and had first-hand knowledge of the purpose of its location. Witness 2's description of the ranch is corroborated by the fact that agents served a federal search warrant on that property on September 8, 2022, and seized over 31 assault rifles along with drug packaging, U.S. currency and drugs.

33.    On March 29, 2023, agents again interviewed Witness 2 and learned that MADRIGAL was residing at the residence and was getting ready to flee to Mexico to avoid capture by law enforcement. Witness 2 told agents that the Goodfellow Ave. residence's basement was also used to store distributable amounts of narcotics and that he observed this firsthand.

34.    Witness 2 has proven to be credible source of information to law enforcement. Witness 2's statements have been corroborated by both witness interviews and facts (such as the September 2023 discovery of Murillo's and Hernandez's buried remains) over the course of the investigation.

**Witness 1's Interview**

35.    Witness 1 is related to HERNANDEZ. S/he substantially corroborated Witness 2's version of events. Witness 1 told agents that after they [HSI] interviewed HERNANDEZ and MURILLO on August 23, 2022, MADRIGAL picked up MURILLO from Witness 1's house a few days later and MURILLO was never seen again. MADRIGAL told Witness 1 that he was taking MURILLO to "feed the chickens."

36.    Then on September 2, 2022, MADRIGAL messaged Witness 1 and asked him/her to take HERNANDEZ to a hotel parking lot in Yakima, Washington. Initially, Witness 1 said that MADRIGAL was going to take HERNANDEZ to meet MURILLO at the ranch and that MURILLO was waiting for her there. MADRIGAL had set up a trailer where HERNANDEZ and MURILLO could hide out. Witness 1 told agents that MADRIGAL was going to take HERNANDEZ to a nearby residence to meet MURILLO. Witness 1 drove HERNANDEZ, to a parking lot where MADRIGAL was waiting. Witness 1 stated s/he knew it was MADRIGAL because HERNANDEZ got into a vehicle only

13

driven by Benjamin MADRIGAL. Witness 1 saw MADRIGAL drive HERNANDEZ in the direction of the ranch outside of Yakima and Witness 1 had a "bad feeling." That was the last time Witness 1 or anyone else saw HERNANDEZ. At that time, Witness 1 believed that Maira HERNANDEZ and MURILLO had fled to Mexico.

37.    Witness 1 also stated that MADRIGAL's brother was working for MURILLO by transporting drugs in vehicles when he was arrested on June 24, 2022. Witness 1 said that MADRIGAL's brother called her around June 23, 2022, and was boasting that he was smuggling drugs. MADRIGAL's brother told her that they were taking a vehicle loaded with drugs, to Visalia, California. He was working for MURILLO at that time. Witness 1 knows this because she was living with MURILLO and HERNANDEZ during the summer of 2022 and s/he would often see MURILLO unloading and weighing drugs at their home in Yakima, Washington.  S/he saw them handle large amounts of a substances that she described as crystal-like substances, white powder, and blue pills. Witness 1 also saw suitcases full of cash in here residence being handled by MURILLO and MADRIGAL for the DTO.

**MADRIGAL's June 2021 arrest**

38.    At the time of his arrest on April 3, 2023, MADRIGAL was charged in the District of Oregon (Case No. 22-CR-76) with possession with intent to distribute fentanyl and methamphetamine and is a fugitive from that case. He was arrested on June 19, 2021, as the passenger in a vehicle that contained approximately 55 pounds of methamphetamine, 953 grams of cocaine, and one kilo of fentanyl. MADRIGAL was initially charged in an Oregon state court. He failed to appear and has been a fugitive since that time. He was indicted in the District of Oregon on March 3, 2022.

39.    At the time of his arrest in June 2021 MADRIGAL possessed a fake driver's license, using the identify "Tony Lomas" and two cell phones with different phone numbers with two different area codes. In addition to the two phones, MADRIGAL used two separate iCloud accounts. Subpoenas served to each cellular provider listed the name as Tony Lomas.

**MADRIGAL'S April 2023 arrest**

40.     On April 3, 2023, agents went to 19161 Goodfellow Ave. to execute a search warrant for the property and to arrest MADRIGAL. As agents approached the residence, MADRIGAL jumped out of a window and fled across a field. Agents apprehended MADRIGAL after a short foot chase. Agents searched 19161 Goodfellow Ave., and certain electronic devices found therein, and found evidence of drug trafficking. However, in an abundance of caution I am requesting that this Court determine whether there is probable cause to search the target devices without regard to the results of that search. In addition, I request that this Court not consider any statements MADRIGAL made following his April 3, 2023, arrest.

41.     I believe that due to the haste with which MADRIGAL left the residence, he inadvertently left the **Target Devices** behind. As noted above, the current resident found the Target Devices in February 2025 in a computer bag that blended into a laundry room wall and were unnoticed except upon cleaning and inspection of that wall. Agents did not discover that bag when they searched the residence on April 3, 2023, because it was concealed on or in that wall. Since the current resident disclaims ownership of the bag, I believe it must have been left there by the prior resident. MADRIGAL is the last known prior resident of the residence. For the reasons set forth below, I believe it is probable that MADRIGAL used the **Target Devices** in connection with the DTO which he managed from the residence immediately prior to his April 2023 arrest.

**MURILLO's and HERNANDEZ's remains found**

42.     On September 13, 2023, Agents located the remains of Maira HERNANDEZ and Cesar MURILLO. They were each buried in a dirt road, approximately one-half mile from each other and one-half mile from the ranch that agents searched on September 8, 2022. The bodies were buried approximately 6-7 feet below the surface. In October 2023 a Forensic Pathologist conducted autopsies on both bodies. Both victims died from multiple

gunshot wounds. HERNANDEZ was carrying a fetus of approximately six-months gestation.

## BASIS FOR EVIDENCE SOUGHT IN SEARCH WARRANT

43.    During this investigation, agents have reviewed thousands of messages seized from dozens of cellular telephones belonging to DTO members. These messages show that DTO members have used and are continuing to use a variety of electronic devices, including cellular telephones, computers, iPads, electronic storage devices, like compact disks and USB drives, and DVR video recorders (like the **Target Devices**) as part of the DTO's operations. I know that it is common for DTOs to use cellular telephones and other electronic devices to send messages detailing their drug and firearms trafficking as well as money laundering activities through encrypted application platforms to other DTO members (iPads and computers can also access these application platforms to send messages as well as cellular telephones). I know that DTO members will use computers and iPads to compile and send Excel and PDF files (which are typically transmitted as screenshots of computer and iPad screens) to show money paid and owed to the DTO for drugs as well as payroll and expenses. These payroll and expense reports show that DTOs may purchase electronic devices like computers, iPads, and electronic storage devices such as compact disks and USB drives for the use of DTO members. I also know that DTOs may operate front businesses such as restaurants, bars, and trucking companies, to conceal the DTO's criminal operations. DTO members have used electronic devices like the **Target Devices** to conduct the operations of these businesses on behalf of the DTO. In addition, DTO members may use electronic devices like DVRs and video cameras to monitor locations controlled by the DTO.

44.    Based on my training and experience, along with the sophisticated nature of MADRIGAL's DTO operations as discussed above, I believe that MADRIGAL used the **Target Devices** to conduct illicit activities on behalf of the DTO. Specifically, I believe that sophisticated drug traffickers and money launderers like the charged defendants and

their co-conspirators use multiple telephones, computers, and other electronic devices like the **Target Devices** to compartmentalize their illegal activities and shield themselves from law enforcement scrutiny.

45.     Based on my experience investigating transnational criminal organizations and the MADRIGAL DTO drug trafficking and money laundering methods as well as my consultations with other law enforcement officers, I believe that MADRIGAL may have used the **Target Devices** to coordinate with co-conspirators regarding the importation, distribution, transport, storage, of controlled substances and the subsequent laundering of bulk cash narcotics proceeds. I also know that recent calls made and received, telephone numbers, contact names, electronic mail (email) addresses, appointment dates, text messages, pictures and other digital information are stored in the memory of cellular telephones, tablets and computers and other electronic devices, which may identify other persons involved in drug trafficking and money laundering activities.

46.     Based upon my experience and training, consultation with other law enforcement officers experienced in narcotics trafficking and money laundering investigations, and all the facts and opinions set forth in this affidavit, I believe that information relevant to the drug trafficking and money laundering activities of the MADRIGAL DTO  and their co-conspirators, such as telephone numbers, made and received calls, contact names, electronic mail (email) addresses, appointment dates, messages, videos, pictures, and other digital information are stored in the memory of the **Target Devices**.

47.     Based on the length of the MADRIGAL DTO's criminal activities, dating back to at least June of 2021, and the sophistication of their drug and firearm trafficking and money-laundering activities detailed in this affidavit, I now seek permission to search the **Target Device** from **June 1, 2021, through April 3, 2023.**

48.     Based upon my training and experience as a Special Agent, and consultations with law enforcement officers experienced in drug trafficking and money laundering

investigations, and all the facts and opinions set forth in the affidavit, I submit the following:

    a.    Drug traffickers and money laundering facilitators use cellular telephones, computers, and other electronic devices with internet access because they are mobile and they have instant access to telephone calls, text, web, and voice messages.

    b.    Drug traffickers and money laundering facilitators believe that cellular telephones, computers, and other electronic devices with internet access provide greater insulation and protection against court-ordered wiretaps, and they believe in the inability of law enforcement personnel to simultaneously track the originating and destination telephone numbers of calls placed to and from their cellular telephones and or other electronic devices.

    c.    Drug traffickers and money laundering facilitators use cellular telephones, computers, and other electronic devices with internet access because they are able to actively monitor the progress of their illegal cargo while the conveyance is in transit.

    d.    Drug traffickers and money laundering facilitators and their accomplices use cellular telephones, computers, and other electronic devices with internet access because they can easily arrange and/or determine what time their illegal cargo will arrive at predetermined locations.

    e.    Drug traffickers and money laundering facilitators use cellular telephones, computers, and other electronic devices with internet access to direct drivers to synchronize an exact drop off and/or pick up time of their illegal cargo.

    f.    Drug traffickers and money laundering facilitators use cellular telephones, computers, and other electronic devices with internet access to notify or warn their accomplices of law enforcement activity to include the presence and posture of U.S. and foreign law enforcement agents. Individuals involved in transnational criminal organizations use cellular telephones, computers, and electronic communication and storage devices to conduct their criminal activities. An examination of the **Target Device** will enable investigators to establish further evidence of drug trafficking as well as money laundering and the identification of co-conspirators.

18

g.  Cellular telephones, computers, and electronic communication devices (Tablets, I-Pads, etc.) are capable of storing many different types of data that are invaluable to investigators and could be evidence of criminal conduct. This data, sought pursuant to the requested search warrants, consists of the contents of the cell phones' or electronic communication devices' memory, including: stored names and telephone numbers in the memory, "phonebook" or list of contacts, and/or speed dial functions of the phones; phone numbers dialed for the most recent outgoing or "sent" calls of the telephones, along with date and time of call data; phone numbers dialing the telephones for the most recent incoming "received" calls, along with date and time of the call data; phone numbers dialing the telephone for the most recent "missed" calls, along with the date and time of call data; GPS navigation information; internet searches and websites viewed; and deleted data.

h.  Drug traffickers and money laundering facilitators commonly use cellular telephones, blackberries, PDAs, electronic communication devices, other personal handheld electronic devices, and laptop and desktop computers to communicate with, among others, their customers, their suppliers, and other criminal associates, and to store phone numbers, text messages, emails, photographs, physical and email addresses, and other information that constitutes evidence of their criminal activities. Drug traffickers and money laundering facilitators also commonly store records of the business of distributing and selling drugs and bulk cash drug proceeds, on telephones, computers, and other forms of digital media.

## PROCEDURES FOR ELECTRONICALLY STORED INFORMATION – COMPUTERS AND OTHER ELECTRONIC STORAGE MEDIA

49.  With the approval of the Court in signing this warrant, agents executing this search warrant will employ the following procedures regarding computers and other electronic storage devices, including electronic storage media, that may contain data subject to seizure pursuant to this warrant:

### Forensic Imaging

a.  Computers and other electronic storage devices, including any necessary peripheral devices, will be transported offsite for imaging. A forensic image is an exact physical copy of the hard drive or other media. A forensic image captures all the data on the hard drive or other media without the data being viewed and without changing the data.

19

Absent unusual circumstances, it is essential that a forensic image be obtained prior to conducting any search of the data for information subject to seizure pursuant to this warrant. Based on the foregoing, the personnel conducting the forensic imaging will complete the forensic imaging of the **Target Device** within **ninety (90) days** of this warrant, absent further application to this court

<u>Identification And Extraction of Relevant Data</u>

b.    After obtaining a forensic image, the data will be analyzed to identify and extract data subject to seizure pursuant to this warrant.  Analysis of the data following the creation of the forensic image can be a highly technical process requiring specific expertise, equipment and software. There are thousands of different hardware items and software programs, and different versions of the same programs, that can be commercially purchased, installed, and custom-configured on a user's computer system.  Computers are easily customized by their users.  Even apparently identical computers in an office or home environment can be different with respect to configuration, including permissions and access rights, passwords, data storage, and security.  It is not unusual for a computer forensic examiner to have to obtain specialized hardware or software, and train with it, in order to view and analyze imaged data.

c.    Analyzing the contents of a computer or other electronic storage device, even without significant technical challenges, can be very challenging.  Searching by keywords, for example, often yields many thousands of hits, each of which must be reviewed in its context by the examiner to determine whether the data is within the scope of the warrant. Merely finding a relevant hit does not end the review process for several reasons.  The computer may have stored metadata and other information about a relevant electronic record – e.g., who created it, when and how it was created or downloaded or copied, when it was last accessed, when it was last modified, when it was last printed, and when it was deleted.  Keyword searches may also fail to discover relevant electronic records, depending on how the records were created, stored, or used.  For example, keywords search text, but

many common electronic mail, database, and spreadsheet applications do not store data as searchable text. Instead, the data is saved in a proprietary non-text format. Documents printed by the computer, even if the document was never saved to the hard drive, are recoverable by forensic programs because the printed document is stored as a graphic image. Graphic images, unlike text, are not subject to keyword searches. Similarly, faxes sent to the computer are stored as graphic images and not as text. In addition, a particular relevant piece of data does not exist in a vacuum. To determine who created, modified, copied, downloaded, transferred, communicated about, deleted, or printed the data requires a search of other events that occurred on the computer in the time periods surrounding activity regarding the relevant data. Information about which user had logged in, whether users share passwords, whether the computer was connected to other computers or networks, and whether the user accessed or used other programs or services in the time period surrounding events with the relevant data can help determine who was sitting at the keyboard.

        d.     It is often difficult or impossible to determine the identity of the person using the computer when incriminating data has been created, modified, accessed, deleted, printed, copied, uploaded, or downloaded solely by reviewing the incriminating data. Computers generate substantial information about data and about users that generally is not visible to users. Computer-generated data, including registry information, computer logs, user profiles and passwords, web-browsing history, cookies and application and operating system metadata, often provides evidence of who was using the computer at a relevant time. In addition, evidence such as electronic mail, chat sessions, photographs and videos, calendars and address books stored on the computer may identify the user at a particular, relevant time. The manner in which the user has structured and named files, run or accessed particular applications, and created or accessed other, non-incriminating files or documents, may serve to identify a particular user. For example, if an incriminating document is found on the computer but attribution is an issue, other documents or files

created around that same time may provide circumstantial evidence of the identity of the user that created the incriminating document.

e.    Analyzing data has become increasingly time-consuming as the volume of data stored on a typical computer system and available storage devices has become mind-boggling.  For example, a single megabyte of storage space is roughly equivalent of 500 double-spaced pages of text.  A single gigabyte of storage space, or 1,000 megabytes, is roughly equivalent of 500,000 double-spaced pages of text.  Computer hard drives are now being sold for personal computers capable of storing up to 2 terabytes (2,000 gigabytes) of data.  And this data may be stored in a variety of formats or encrypted (several new commercially available operating systems provide for automatic encryption of data upon shutdown of the computer).  The sheer volume of data also has extended the time that it takes to analyze data.  Running keyword searches takes longer and results in more hits that must be individually examined for relevance.   And, once reviewed, relevant data leads to new keywords and new avenues for identifying data subject to seizure pursuant to the warrant.

f.    Based on the foregoing, identifying and extracting data subject to seizure pursuant to this warrant may require a range of data analysis techniques, including hashing tools to identify data subject to seizure pursuant to this warrant, and to exclude certain data from analysis, such as known operating system and application files.  The identification and extraction process, accordingly, may take weeks or months. The personnel conducting the identification and extraction of data will complete the analysis within **one-hundred twenty (120) days** of this warrant, absent further application to this court.

g.    All forensic analysis of the imaged data will employ search protocols directed exclusively to the identification and extraction of data within the scope of this warrant.

**PRIOR ATTEMPTS TO OBTAIN THIS EVIDENCE**

50.    The United States has not attempted to obtain this data by other means.

22

## **CONCLUSION**

51.    Based upon my experience and training, consultation with other law enforcement officers, and all the facts and opinions set forth in this affidavit, I believe that probable cause exists to conclude that the **Target Devices**, as further described in Attachments A-1 through A-3, incorporated herein, were utilized to facilitate Title 21, United States Code, Sections 841(a)(1), 846, 952, 959, 960, 963 (Possession of Controlled Substances with Intent to Distribute; Conspiracy to Distribute Controlled Substances; International Conspiracy to Distribute Controlled Substances, Importation of Controlled Substances and Conspiracy) and Title 18, United States Code, Sections 1503 (Influencing or Injuring Officer or Juror) and 1956 (Money Laundering and Conspiracy).  Furthermore, I believe there is probable cause to conclude that the **Target Devices** contain stored data that constitutes evidence, fruits, and instrumentalities of such violations, and I respectfully request warrants be issued authorizing a search for and seizure of that data, as further described in Attachment B, incorporated herein.

52.    Therefore, I respectfully request that the Court issue a warrant authorizing me, an HSI Special Agent, or another federal law enforcement agent specially trained in digital evidence recovery, to search the items described in Attachments A-1 through A-3, and seize the items listed in Attachment B. I declare under penalty and perjury the foregoing is true and correct to the best of my knowledge and belief.


*Travis Desmond*
Special Agent Travis Desmond
Homeland Security Investigations

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone on this 10th day of April, 2025.


The Honorable   Michael S. Berg
United States Magistrate Judge

23

<u>ATTACHMENT A-1</u>

Device to be Searched

Target Device 1 is described as a Blue ASUS Model # TP200S Laptop Computer, FP&F 2025250100031901-001 (**Target Device 1**).

## ATTACHMENT B

Description of Items to be Seized

Documents, items, and records, as defined below, pertaining to MADRIGAL, from June 1, 2021 through April 3, 2023, for items that constitute evidence, fruits, or instrumentalities of violations of federal criminal law, namely: Title 21, United States Code, Sections 841(a)(1), 846, 952, 960, 963 (Possession of Controlled Substances with Intent to Distribute; Conspiracy to Distribute Controlled Substances; Importation of Controlled Substances and Conspiracy), and 848(e) (murder in furtherance of a drug trafficking conspiracy); Title 18, United States Code Section 1512(a)(1)(A) (Witness Tampering by murder), and 1956 (Money Laundering) (collectively referred to as the Target Offenses).

As used throughout this Attachment B, the terms "items," "documents", and "records" include all of the following items of evidence in whatever form, including all temporary and permanent electronic files and records, and by whatever means they may have been created or stored, including any electrical, electronic, or magnetic form (such as any information on an electronic or magnetic storage device, including thumb drives, hard disks, ZIP disks, CD-ROMs, personal digital assistants, as well as printouts or readouts from any magnetic storage device); any handmade form (such as writing, drawing, painting); any mechanical form (such as printing or typing); and any photographic form (such as microfilm, microfiche, prints, slides, negatives, videotapes, photocopies).

This authorization includes the search of electronic data to include deleted data, remnant data, and slack space. The search of computers, computer media, and portable electronic devices will be conducted pursuant to additional search warrants.

Items to be seized under this Attachment B include the following:
   a. tending to identify attempts to import and distribute controlled substances, and the collection and transportation of bulk cash proceeds from the sale or distribution of

controlled substances within the United States and between the United States and Mexico;

b. tending to identify accounts, facilities, storage devices, and/or services–such as email addresses, IP addresses, and phone numbers–used to facilitate the importation and distribution of controlled substances and the collection and transportation of bulk cash proceeds from the sale or distribution of controlled substances within the United States and between the United States and Mexico;

c. tending to identify communications regarding pending judicial matters involving MADRIGAL and/or his co-conspirators, or attempts to impede law enforcement in their investigative duties;

d. tending to identify co-conspirators, criminal associates, or others involved in the importation and distribution of controlled substances and the collection and transportation of bulk cash proceeds from the sale or distribution of controlled substances within the United States and between the United States and Mexico;

e. tending to identify travel to or presence at locations involved in the importation and distribution of controlled substances and the collection and transportation of bulk cash proceeds from the sale or distribution of controlled substances within the United States and between the United States and Mexico, such as stash houses, load houses, or delivery points;

f. tending to identify the user of, or persons with control over or access to, the **Target Device**; and/or

g. tending to place in context, identify the creator or recipient of, or establish the time of creation or receipt of communications, records, or data involved in the activities described above.